BARRY J. PORTMAN
Federal Public Defender
STEVEN G. KALAR
Assistant Federal Public Defender
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700

Counsel for Defendant Linda Ashiegbu

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) No. CR 07-0654 CRB |
| Plaintiff, | ) |
| | ) DEFENDANT'S MOTIONS |
| | ) TO SUPPRESS FRUITS OF |
| v. | ) AN UNLAWFUL SEARCH, |
| | ) AND STATEMENTS |
| | ) ELICITED DURING A |
| LINDA ASHIEGBU and EMMANUEL | ) CUSTODIAL |
| ANYANWU, | ) INTERROGATION |
| | ) |
| Defendants. | ) |
| | ) **Hearing Date**: Wednesday, |
| | June 11, 2008 at 2:15 p.m. |

**Evidentiary Hearing
Requested**

1
2
3                              **Table of Contents**
4
5    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
6
     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
7
     Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
8
9    I.    This Court Should Suppress the Fruits of an Unlawful Search, Conducted in
           Violation of Federal Rule of Criminal Procedure 41 . . . . . . . . . . . . . . . . . . . . . . . 6
10
11   II.   The Court Should Suppress the Statements of Ms. Ashiegbu Elicited During an
           Un-*Mirandized* Custodial Interrogation, When She Was Not Permitted to Speak to
12         Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
13
           A.    Ms. Ashiegbu Was Subjected to a Custodial Interrogation that Triggered
14               Her *Miranda* Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
15
           B.    Because There Was No Valid *Miranda* Advisement or Waiver, Ms.
16               Ashiegbu's Statements Elicited During a Custodial Interrogation Must Be
                 Suppressed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
17
18         C.    Custodial Interrogation Was Unlawful After Ms. Ashiegbu Invoked Her
                 Right to Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
19
20         D.    Ms. Ashiegbu Did Not Waive Her *Miranda* Rights or Abandon Her Right
                 to Speak to Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
21
           E.    The Defense Requests an Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . 17
22
23         F.    The Defense Invites the Government to Participate in a Settlement
                 Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
24
25   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
26
27
28

1

2

# Table of Authorities

3

## Federal Cases

4

*Alvarez v. Gomez*, 185 F.3d 995 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

5

6

*Colorado v. Connelly*, 479 U.S. 157 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

7

*Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 16

8

*Davis v. United States*, 512 U.S. 452 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

9

*Dickerson v. United States*, 530 U.S. 428 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

10

11

*Edwards v. Arizona*, 451 U.S. 477 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

12

*Groh v. Ramirez*, 540 U.S. 551 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

13

14

*Lego v. Twomey*, 404 U.S. 477 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

15

*Minnick v. Mississippi*, 498 U.S. 146 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

16

*Miranda v. Arizona*, 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

17

*Missouri v. Seibert*, 124 S. Ct. 2601 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

18

19

*Paulino v. Castro*, 371 F.3d 1083 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

20

*Smith v. Endell*, 860 F.2d 1528 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

21

*Smith v. Illinois*, 469 U.S. 91 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

22

23

*Stansbury v. California*, 511 U.S. 318 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

24

*United States v. Andaverde*, 64 F.3d 1305 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . 13

25

*United States v. Bekowies*, 432 F.2d 8 (9th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

26

*United States v. Brady*, 819 F.2d 884 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

27

28

*United States v. Gantt*, 194 F.3d 987 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

1
2

**Table of Authorities (cont.)**

3
4
5

*United States v. Garibay*, 143 F.3d 534 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Heldt*, 745 F.2d 1275 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States  v. Henley*, 984 F.2d 1040 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Kim*, 292 F.3d 969 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Mann*, 389 F.3d 869 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Madoch*, 149 F.3d 596 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . 11, 12, 17

*United States v. Rodriguez*, 518 F.3d 1072 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Rodriguez-Preciado*, 399 F.3d 1118 (9th Cir. 2005) . . . . . . . . . . . . . . 12

*United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Williamson*, 439 F.3d 1125 (9th Cir. 2006) . . . . . . . . . . . . . . . . 6, 7, 8, 9

*United States v. Younger*, 398 F.3d 1179 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 13

6
7
8
9
10
11
12
13
14
15
16
17
18

**Federal Rules**

19
20

Fed. R. Crim. P. 41(f)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

21
22
23
24
25
26
27
28

1  BARRY J. PORTMAN
2  Federal Public Defender
   STEVEN G. KALAR
3  Assistant Federal Public Defender
   450 Golden Gate Avenue
4  San Francisco, CA 94102
   Telephone: (415) 436-7700
5
6  Counsel for Defendant Linda Ashiegbu
7
8              IN THE UNITED STATES DISTRICT COURT
9
           FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11  UNITED STATES OF AMERICA,              )  No. CR 07-0654 CRB
                                           )
12          Plaintiff,                     )  DEFENDANT'S MOTIONS
                                           )  TO SUPPRESS FRUITS OF
13      v.                                 )  AN UNLAWFUL SEARCH,
                                           )  AND STATEMENTS
14                                         )  ELICITED DURING A
15  LINDA ASHIEGBU and EMMANUEL            )  CUSTODIAL
    ANYANWU,                               )  INTERROGATION
16                                         )
            Defendants.                    )
17                                         )
    _____)  **Hearing Date**: Wednesday,
18                                            June 11, 2008 at 2:15 p.m.
19
                                             **Evidentiary Hearing**
20                                           **Requested**
21
22      TO: THE UNITED STATES OF AMERICA, PLAINTIFF; AND JOSEPH P.
    RUSSONIELLO, UNITED STATES ATTORNEY, NORTHERN DISTRICT OF
23  CALIFORNIA; AND ALLISON DANNER, ASSISTANT UNITED STATES
    ATTORNEY:
24
25      PLEASE TAKE NOTE that on June 11, 2008 at 2:15 p.m., Ms. Linda Ashiegbu
26  will move this Court to suppress her statements elicited during a custodial interrogation.
27  This motion is based on the Constitution of the United States, all relevant case law and
28  statutory authority, and such argument as the Court will entertain at the motion hearing. If
    necessary, Ms. Ashiegbu respectfully requests an evidentiary hearing.

## Introduction

In this motion, Linda and Andrew Ashiegbu move to suppress the fruits of the June 6, 2007 search of their home under Federal Rule of Criminal Procedure 41.[1]

In addition, Ms. Linda Ashiegbu moves this Court to suppress statements elicited from her by ICE Special Agent Leslie Brown, during an un-*Mirandized* custodial interrogation.

## Background

### I.    The Ashiegbus Are Charged With Felonies, For Allegedly Helping Two of Linda's Siblings Get Immigration Status

As the Court recalls, there are two cases before it that involve related family members and separate charges. Undersigned counsel represents Linda Ashiegbu in the matter of *United States v. Linda Ashiegbu and Emmanuel Anyanwu*, CR 07-0654 CRB. Linda Ashiegbu was born in Nigeria and is a naturalized United States citizen. Her brother, Emmanuel, is Nigerian. He is presently a fugitive. The charges against Linda Ashiegbu and her brother, Emmanuel, involve making false statements on immigration documents in violation of Section 1546(a) of Title 18, and conspiring to make false statements to an agency of the United States, in violation of Section 371 of Title 18.

Linda Ashiegbu's husband and sister are charged in the second case, *United States v. Andrew Ashiegbu and Doris Anyanwu*, CR 07-0677 CRB. Andrew Ashiegbu was born in Nigeria and is a naturalized United States citizen. Doris Anyanwu was born in Nigeria, and her immigration status in the United States may be one issue in the trial of the 07-0677 case. The charges in the *Andrew Ashiegbu* case mirror those of the *Linda Ashiegbu*

---

[1] The factual basis for the motion to suppress under Rule 41 became known during briefing on the Fifth Amendment motion to suppress statements, and had not yet been identified when the parties set the briefing schedule at the last appearance before the Court. If the government needs additional time to respond to this Rule 41 motion, the defense will agree to a modified briefing schedule and will join in a proposed stipulated order continuing the June 11th motion hearing. Undersigned counsel called AUSA Danner before this motion was filed, described the Rule 41 motion, and offered to prepare a stipulation for additional time for the Opposition if necessary.

1  case.

2          On April 4th of this year, the government responded to the Court's invitation to

3  describe the allegations and evidence in these two cases. *See Letter of AUSA Danner to*

4  *the Hon. Stephen (sic) Breyer, Apr. 4, 2008*. In that letter, the government explained its

5  theory of the *Linda Ashiegbu* case: that Linda and Emmanuel conspired to effectively

6  commit marriage fraud using the identify of an American citizen named Kevina Mays.

7  This was done, according to the government, to facilitate the immigration application of

8  Emmanuel. *Id.* Evidence in the government's case includes statements allegedly made by

9  Ms. Ashiegbu. *See id.* at 3 ("In a *Mirandized* interview, Linda Ashiegbu admitted to

10  Special Agent Brown that she filed this tax return on Ms. May's behalf.")

11         In its Response to the government's letter, the defense elaborated further on the

12  descriptions of this pair of cases. Specifically, the defense noted that the Sentencing

13  Commission considers the alleged conduct so minor that under the Sentencing Guidelines

14  these defendants[2] are in Criminal History Category I, Offense Level 8, *after* trial. *See Def.*

15  *Response to Gov't Letter and Exh. List*, CR 07-0654 (N.D. Cal. Apr. 18, 2008).  Thus,

16  under the guideline analysis, "acceptance of responsibility" does not come into play: the

17  defendants's guideline range is 0-6 months, in Zone A of the guideline table, with either

18  an early plea *or* a vigorously-contested trial. In its Response the defense invited the

19  government to participate in a settlement conference, and renews that invitation here.

20  **II.     The June 6th Search and Custodial Interrogation**

21         One year ago – and before the initiation of this criminal case – Linda Ashiegbu

22  and her husband, Andrew, had retained attorney Phil Vaughns. *See Exhibit A, Declaration*

23  *of Linda Ashiegbu* ("*L. Ashiegbu Decl.*") at 1 ¶¶ 1-2. During the morning of June 6, 2007,

24  Linda Ashiegbu was in her Hayward home along with her husband, Andrew, and two of

25  her children, aged five and one. *Id.* at 1 ¶ 3, 3 ¶ 21.

26         Linda Ashiegbu was in her bed, upstairs, on the second floor of her home. *Id.* at 1

27

28

_____

[2] These guideline calculations exclude Emmanuel Anyanwu, who is a fugitive.

¶ 3. At 9:07 a.m., she was speaking with her friend, "Ada." *Id.* at 1 ¶ 3, ¶4.[3]

As she laid in bed and spoke to her girlfriend on the morning of June 6th, Linda Ashiegbu was dressed in a very transparent nightgown and was not wearing underwear or a bra. *Id.* at 2 ¶¶ 5, 6. This fact is important, because she would be forced to wear this "nightie" during the entire morning's events.

Linda's husband, Andrew, was downstairs and thus answered the doors when the ICE agents knocked to execute a search warrant. *Id.* at 2 ¶ 7; *see also Exhibit 2, Decl. Andrew Ashiegbu* ("*A. Ashiegbu Dec.*") at 1 ¶ 1. The agents did not give Andrew a copy of the search warrant when they came into the house, did not explain the contents of the warrant, and did not explain to Andrew the purpose of the search or what was sought. *Id.* at 1 ¶ 2.

Linda – who originally thought police officers were responding to a inadvertent 9-1-1 call from her children – next heard a male agent yell upstairs and order her out of her bedroom. *Exh. 1, L. Ashiegbu Decl.* at 2 ¶ 9. Linda came out of her bedroom and was ordered to put her hand above her head and come downstairs. *Id.* at 2 ¶ 10. The male ICE agent who barked these orders had a gun trained at her. *Id.*

Linda – who was effectively nude – begged the agents, "I am naked! Can I please put on some pants?" *Id.* at 2 ¶ 12. The agent refused to allow her to get dressed, and ordered her downstairs with her hands up. *Id.* Ms. Ashiegbu was understandably ashamed and humiliated to be essentially naked in front of strangers – and particularly in front of male agents. *Id.* at 2 ¶ 14.

A male agent then came upstairs, pointing a gun at Ms. Ashiegbu. *Id.* at 2 ¶ 15. The agent handcuffed Ms. Ashiegbu behind her back. *Id.* Ms. Ashiegbu would not be permitted to put on proper clothing for almost three hours, as agents searched her home and interrogated her. *Id.* at 2 ¶ 15.

Ms. Ashiegbu was not *Mirandized* by the agent who handcuffed her. *Id.* at 3 ¶ 17.

---

[3] The timing of events on the morning of June 6 are confirmed by cell phone records that are attached to the declaration. *See Exh. A, L. Ashiegbu Decl.* at 4.

1  As she stood there, handcuffed, the agent asked her a series of questions. *Id.* at 3 ¶ 18.

2      Linda Ashiegbu was eventually taken downstairs, where she found her husband,

3  handcuffed, on the couch of their living room and her two young children crying

4  inconsolably. *Id.* at 3 ¶ 21.

5      Ms. Ashiegbu was ordered to sit next to her husband. She did, and then told the

6  agents – directly and loud enough for them to clearly hear – that she wanted to call her

7  attorney, Mr. Vaughns. *Id.* at 3 ¶ 22. The agents ignored her request. *Id.* at 3 ¶ 23.

8  Because she was handcuffed, behind her back, Ms. Ashiegbu had no way to call her

9  attorney without the agents's acquiescence. *Id.* at 3 ¶ 24.

10      As the morning progressed and the agents's search continued, Ms. Ashiegbu again

11  demanded, "Don't I have the right to call my attorney?" *Id.* at 3 ¶ 26. A male ICE agent

12  responded to this demand with an inquisitive and concerned  expression directed at ICE

13  Special Agent Leslie Brown, who laughed in a mocking and dismissive way. *Id.* at 3 ¶ 27,

14  4 ¶ 28.

15      At roughly 11:37 a.m., Agent Brown ordered Linda Ashiegbu to call her siblings

16  (Doris and Emmanuel) and tell them to come to the Ashiegbu's home. *Id.* at 4 ¶ 31.

17  Complying with this order, Ms. Ashiegbu tried to call her sister, Doris. *Id.* at 4 ¶ 32.

18      Between 11:37 a.m. and noon, Agent Brown took Ms. Ashiegbu away from the

19  living room and to the breakfast table in the kitchen. *Id.* at 4 ¶ 34. Agent Brown did not

20  *Mirandize* Ms. Ashiegbu – indeed, no agent *Mirandized* Ms. Ashiegbu that morning. *Id.*

21  at 5 ¶ 44. Agent Brown asked Ms. Ashiegbu a series of questions and showed her

22  immigration documents from a larger binder. *Id.* at 4 ¶¶ 36, 37. When Agent Brown

23  began the questioning, Ms. Ashiegbu was still in handcuffs. *Id.* at 5 ¶ 38.

24      In the middle of the interrogation Agent Brown threatened Ms. Ashiegbu, warning

25  that if Linda lied to the agent they would take Linda away from her children and put her

26  in jail. *Id.* at 5 ¶ 40. At the end of this custodial interrogation Linda asked, "Don't I have

27  the right to remain silent?" *Id.* at 5 ¶ 42. Agent Brown conceded – for the first time – that

28  Ms. Ashiegbu did have this *Miranda* right. *Id.* at 5 ¶ 43. Agent Brown did not advise Ms.

Ashiegbu of any other *Miranda* rights. *Id.* at 5 ¶ 44.

1   At noon – roughly three hours after the invasion of the home by the ICE agents,

2   after repeated demands to speak to counsel, and after the custodial interrogation was

3   complete – Linda Ashiegbu was finally allowed to call Mr. Vaughns. *Id.* at 5. Just before

4   the agents left, they gave Andrew Ashiegbu a copy of the search warrant. *Id.* at 5 ¶ 47.

5   That was the first time the Ashiegbus had been given a copy of the warrant. *Id.* at 5 ¶ 48.

**Discussion**

6

**I.     This Court Should Suppress the Fruits of an Unlawful Search, Conducted in
7        Violation of Federal Rule of Criminal Procedure 41**

8

9   This Court should suppress all fruits of the unlawful search of Ms. Ashiegbu's

10  residence on June 6, 2007, because the ICE agents did not provide the Ashiegbus with the

11  search warrant at the outset of the search.

12  Federal Rule of Criminal Procedure 41 describes the procedures for the issuance

13  and service of search warrants. The Rule requires the officer who serves the warrant to

14  "give a copy of the warrant and a receipt for the property taken to the person from whom,

15  or from whose premises, the property was taken or leave a copy of the warrant and receipt

16  that the place where the officer took the property." Fed. R. Crim. P. 41(f)(1)(C). Failure

17  to comply with the procedures set forth in Rule 41 may be the basis for a defense motion

18  to suppress the evidence obtained from the search. *Id.* at 41(h).

19  Since 1999, it has been the rule in the Ninth Circuit that "Absent exigent

20  circumstances, Rule 41(d) requires service of the warrant *at the outset of the search* on

21  persons present at the search of their premises." *United States v. Gantt*, 194 F.3d 987, 990

22  (9th Cir. 1999) (emphasis added). There are compelling reasons for this rule: "an essential

23  function of the warrant is to assure the individual whose property is searched or seized of

24  the lawful authority of the executing officer, his need to search, and the limits of his

25  power to search." *United States v. Williamson*, 439 F.3d 1125, 1132 (9th Cir. 2006)

26  (internal quotations and citations omitted). Moreover, "the warrant gives notice to the

27  person subject to the search what the officers are entitled to seize." *Id.* (internal quotations

28  and citations omitted).

The defense acknowledges that the Ninth Circuit's rule on the timing of Rule 41

1  service – and the suppression remedy – has been the subject of some controversy of late.

2  *See id.* at 1112 & n.4 (discussing *Groh v. Ramirez*, 540 U.S. 551, 562 n.5 (2004), and

3  language in that case on the service of a warrant at the outset of a search). The Ninth

4  Circuit, however, has acknowledged this intervening Supreme Court authority and has

5  repeatedly and explicitly maintained the validity of *Gantt*'s "outset of search" rule. *See,*

6  *e.g., United States v. Mann*, 389 F.3d 869, 875 & n.1 (2004) ("While dicta in the Supreme

7  Court's recent decision in *Groh v. Ramirez* casts serious doubt both on our interpretation

8  of Rule 41 and our reasoning in *Gantt*, it fails definitively to abrogate our holding."); *see*

9  *also Williamson*, 439 F.3d at 1132 ("We must conclude, therefore, under our *current*

10  *jurisprudence* the search violated Rule 41(d) because the agents did not provide a copy of

11  the warrant at the outset of the search.") (emphasis added). Under the controlling

12  authority for this Court – the Ninth's still-viable *Gantt* rule – the ICE Agents violated

13  Rule 41 when they did not serve the Ashiegbus with the search warrant at the outset of

14  the search. *See Exh. A., L. Ashiegbu Decl.* at 5 ¶ 48.

15      It must be conceded that the Ninth Circuit has observed that "[v]iolations of Rule

16  41(d)[4] do not usually demand suppression." *Williamson*, 439 F.3d at 1133. Nonetheless,

17  the Court has identified three circumstances under which suppression is appropriate:

18      1)      the violation rises to a "constitutional magnitude;"

19  
20      2)      the defendant was prejudiced, in the sense that the search would not have
               occurred or would not have been so abrasive if law enforcement had
21             followed the Rule; or

22      3)      officers acted in "intentional and deliberate disregard" of a provision in the
               Rule.
23

24  *Williamson*, 439 F.3d at 1133 (*quoting United States v. Martinez-Garcia*, 397 F.3d 1205,

25  1213 (9th Cir. 2005)).  Because the Ashiegbus were prejudiced by this search, and

26  because the officers acted in "intentional and deliberate disregard" of provision (f)(1)(C)

27  _____

28      [4] At the time of the search in *Williamson*, subsection (d) of Rule 41 dealt with the
    process of warrant service. *Williamson*, 439 F.3d at 1131. That same subsection is now
    found at Rule 41(f)(1)(C).

1   of Rule 41, this Court should suppress the fruits of the search.

2       First, the Ashiegbus were prejudiced by the agents' failure to provide the search

3   warrant at the outset of the search. Assuming (without conceding) the government's

4   version of events, this case involves a married couple lying to ICE to help a pair of

5   siblings – for no payment. This is not a large-scale immigration case or smuggling

6   conspiracy, and it is by no stretch of the imagination a case involving any allegations of

7   violence or weapons. Despite the true nature of this case, in the three hours that the team

8   of ICE agents occupied the Ashiegbu's home they created a humiliating, terrifying, and

9   degrading environment where the defendants were not permitted counsel, were

10  handcuffed, and – in Ms. Ashiegbu's case – were not even permitted the dignity of proper

11  clothing before male strangers. In other words, the ICE agents intentionally created a

12  three-hour "softening period" to break down resistence and produce a more-effective

13  custodial interrogation by Agent Brown at the end of the search. The most potent

14  component of this softening period was not telling the Ashiegbus the reason for the

15  search, or the goals of the search, thus keeping them in the dark during the entire

16  morning. Ms. Ashiegbu was prejudiced by the Agents's failure to provide the warrant at

17  the outset of the search because her bewilderment at the invasion of her home made her

18  more likely to freely speak to Agent Brown, in hopes of receiving some explanation of

19  the morning's chaos.

20      In addition, the agents acted in "intentional and deliberate disregard" of the Rule.

21  The government will have one of two responses to Ms. Ashiegbu's allegations of a Rule

22  41 violation: it will deny the factual allegations (in which case, an evidentiary hearing is

23  necessary), or it will concede that the warrant was not served at the outset of the search

24  but will argue that Agent Brown and her ICE colleagues "'intentionally' – but not

25  'deliberately' failed to provide a copy of the search warrant . . .  before beginning the

26  search." *Williamson*, 439 F.3d at 1133. That "good faith" defense is of no avail in the

27  case before the Court. First, that excuse was exactly the refuge sought by an FBI Agent in

28  *Williamson*, a two-year old, published Ninth Circuit decision. In that case, the FBI agent
    claimed that he was simply unaware that the rule required providing the warrant at the

1 outset of the search, instead of at the end. *Id.* at 1130. Two years after *Williamson*, an ICE

2 agent (who is presumably working with a federal prosecutor in preparing the search

3 warrant) cannot credibly claim that she or he was unaware of the "outset of search" rule

4 in the Ninth Circuit.

5     The facts of the present case are also far more egregious than those of searches

6 tolerated in earlier Rule 41 decisions. For example, the Ninth Circuit in *Williamson*

7 upheld the district court's finding that the failure to provide the warrant at the outset was

8 not an "intentional and deliberate disregard" of the Rule, because the FBI agent in that

9 case intended to provide the warrant, explained the purpose of the investigation and the

10 search in detail at the outset of the search, and limited the scope of the search to items

11 specifically responsive to the investigation. *Id.* at 1129-30. When Williamson's (angry)

12 father came home, the police again attempted to explain the contents of the warrant and

13 the purpose of the search. *Id.* at 1130. In other words, the Rule 41 failure in *Williamson*

14 was "intentional," because the agent intentionally waited until the end of the search to

15 provide the warrant. It was not "deliberate," however, because the FBI agent and the

16 police acted in good faith and carefully explained the purpose and goals of the search. In

17 the present case, by contrast, despite repeated requests the ICE agents did not explain the

18 purpose of the search or the detention to the Ashiegbus. After *Williamson*, and in light of

19 the egregious nature of this search, the agents's failure to provide the warrant at the outset

20 of the June 6 search was both deliberate and intentional. The fruits of that search should

21 therefore be suppressed.

22 **II.    The Court Should Suppress the Statements of Ms. Ashiegbu Elicited During**

23     **an Un-*Mirandized* Custodial Interrogation, When She Was Not Permitted to Speak to Counsel**

24

25     In its exhibit list filed with the Court, the government has made it clear that intends

26 to introduce at trial statements made by Ms. Ashiegbu to ICE Special Agent Leslie

27 Brown. Those statements are presumptively involuntary, were elicited after (repeatedly-

28 denied) requests to speak to counsel, and were not obtained after valid *Miranda* warnings

or waivers were obtained. Those statements, therefore, must be suppressed.

1

2

### A.    Ms. Ashiegbu Was Subjected to a Custodial Interrogation that Triggered Her *Miranda* Rights

3

4

5

The familiar prophylactic protections of *Miranda* apply during an custodial interrogation, before a defendant's constitutional rights are implicated by the initiation of adversary criminal proceedings. *Miranda v. Arizona*, 384 U.S. 436, 469-73 (1966). A

6

7

8

9

10

11

12

13

threshold issue in the suppression motion before this Court is whether the interrogation of Ms. Ashiegbu by Special Agent Brown was "custodial," and therefore triggered the protections of *Miranda*. *See Stansbury v. California*, 511 U.S. 318, 322 (1994) ("An officer's obligation to administer *Miranda* warnings attaches . . . only where there has been such a restriction on a person's freedom as to render him 'in custody.'") (internal quotations and citation omitted).  Under controlling Supreme Court and Ninth Circuit authority, the interrogation of Ms. Ashiegbu was "custodial" and she is accordingly entitled to the full protections of *Miranda*.

14

15

16

17

18

19

20

"To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide 'whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002) (*quoting Stansbury*, 511 U.S. at 322)). "Custody will be found if the person questioned is effectively deprived of his freedom of movement, even though the interrogation occurs in his own home." *United States v. Bekowies*, 432 F.2d 8, 12 (9th Cir. 1970).

21

22

23

24

25

To determine whether a suspect was in "custody," the Court must focus on the objective circumstances of the interrogation, not the subjective views of the officers. *Kim*, 292 F.3d at 973.  "That is, [the Court] must determine whether 'the officers established a setting from which a reasonable person would believe that he or she was not free to leave.'" *Id.* (*quoting United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987)).

26

27

28

Given the objective circumstances of the present case, no reasonable person would believe that they were "free to leave" after being handcuffed at gunpoint, not allowed to change out of a transparent nightie, detained next to a spouse who was also in handcuffs, and forced to sit for hours on a couch while surrounded by a pack of armed federal

1    agents.

2        In facts strikingly similar to those now before this Court, the Ninth Circuit has held

3    that the armed confrontation by federal agents of a mother in her home rises to custodial

4    interrogation that would implicate *Miranda*. *United States v. Madoch*, 149 F.3d 596, 601

5    (9th Cir. 1998). Given the parallels between the two cases, the facts of *Madoch* warrant

6    full recitation:

7        The scene Janice paints of the entry of the federal agents into her home is an
     unpleasant one. The agents served their warrant on her at about 7:00 a.m., when
8    Janice, her husband Larry, her fifteen year- old daughter Cheryl, and her
     six-month-old son William were in the house. As the agents rushed into the house,
9    one of them ordered Janice into the kitchen. Another one reached for his gun when
     she started for the other room to retrieve William. Once she had the baby, she went
10   to the kitchen as instructed, while agents ran through the house yelling. They
     captured Larry and handcuffed him in the family room. In her affidavit, Janice
11   stated that "[b]efore [the agents] ... took my husband outside, he told me to go to
     the bank and take out money for his bail, but ... [the agents] said I couldn't leave
12   the kitchen." The agents also instructed Janice not to answer the telephone, which
     rang numerous times while they all sat in the kitchen and the agents questioned
13   her. After some three and-a-half hours, the agents permitted Janice to get dressed
     and to go to the bathroom to pump out her breast milk, which she did under the
14   watchful eyes of a female agent. She then had to return to the kitchen for further
     interrogation. The agents finally left about five or five-and-a-half hours after they
15   arrived. During all of this, Janice was never informed of her rights under *Miranda*.
16
17
18   *Id.* at 601.

19       The circumstances of Ms. Ashiegbu's interrogation echo those of *Madoch*:
20
21   ● The ICE agents served their warrant in the morning, when Ms. Ashiegbu, her
     husband, and her two very young children were at home. *See Exh. A, L. Ashiegbu
22   Decl.* at 3 ¶ 20;
23
24   ● Ms. Ashiegbu, like the defendant in *Madoch*, was not permitted to use the phone
     except as ordered by Agent Brown. *See Exh. A, L. Ashiegbu Decl.* at 3 ¶ 21, 4 ¶¶
25   28, 30;
26
27   ● Ms. Ashiegbu, like the defendant in *Madoch*, was not allowed to get properly
     dressed for roughly three hours and was effectively nude in front of male agents.
28   *See Exh. A, L. Ashiegbu Decl.* at 3 ¶ 20, 4 ¶ 28;

     ● The agents in both the present case and *Madoch* were present in the home for
     over three hours. *See Exh. A, L. Ashiegbu Decl.* at 5 ¶ 46;

● Neither Ms. Ashiegbu nor the defendant in *Madoch* were given their full *Miranda* rights. *See Exh. A, L. Ashiegbu Decl.* at 5 ¶ 43;

In fact, Ms. Ashiegbu's claim to custodial interrogation is, in some respects, more compelling than that in *Madoch*. In *Madoch*, an FBI agent simply reached for a gun. *Id.* at 601. In the present case, by contrast, a male ICE Agent pointed a gun directly at Ms. Ashiegbu and ordered her hands above her head. *Exh. A, L. Ashiegbu Decl.* at 2 ¶ 9; *see United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005) (discussing whether officers displayed weapons as factor in analysis of whether a custodial interrogation had taken place). In *Madoch*, the defendant's husband was handcuffed. *Madoch*, 149 F.3d at 601. In the present case, *both* Ms. Ashiegbu and her husband, Andrew, were handcuffed for extended periods. *Exh. A, L. Ashiegbu Decl.* at 3 ¶ 20; *see United States v. Brady*, 819 F.2d 884, 887 (9th Cir. 1987) (finding that the fact that suspect was handcuffed before questioning supported conclusion that he was in "custody" for *Miranda* analysis). In *Madoch*, no threat was made regarding the defendant's young children. *Madoch*, 149 F.3d at 601. In the present case, by contrast, Agent Brown threatened to take Ms. Ashiegbu to jail and away from her children. *Exh. A, L. Ashiegbu Decl.* at 5 ¶ 39; *see United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir. 1981) ("When law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit 'cooperation,' they exert the 'improper influence' . . . .")

Agent Brown's interrogation of Ms. Ashiegbu was "custodial" and triggered the protections of *Miranda*. Because there was no valid *Miranda* advisement or waiver, and because Ms. Ashiegbu repeatedly asked to speak to counsel and was not permitted to do so, the statements elicited during this custodial interrogation must be suppressed.

### B.    Because There Was No Valid *Miranda* Advisement or Waiver, Ms. Ashiegbu's Statements Elicited During a Custodial Interrogation Must Be Suppressed

Ms. Ashiegbu was not informed of her *Miranda* rights before she was interrogated, and could not, therefore, have knowingly and voluntarily waived those rights. *See United*

*States v. Henley*, 984 F.2d 1040, 1043 (9th Cir. 1993) ("*Miranda* presumes conclusively that all responses to custodial interrogation are involuntary unless preceded by the prescribed warnings.").

To admit statements obtained by virtue of a custodial interrogation at trial, there must be a showing that the defendant waived her *Miranda* rights. "A defendant's waiver of *Miranda* rights must be 'voluntary, knowing, and intelligent.'" *United States v. Younger*, 398 F.3d 1179, 1185 (9th Cir. 2005) (*quoting United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998)). The government bears the burden of proving that interrogating officers obtained a valid waiver of a suspect's *Miranda* rights. *See Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986). The government must prove a valid waiver by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *see also Missouri v. Seibert*, 124 S. Ct. 2601, 2608 n.1 (2004) (*citing Twomey* for the same proposition). The Ninth Circuit has emphasized that "[t]his burden is great," and that courts "must indulge every reasonable presumption against waiver of fundamental constitutional rights." *United States v. Heldt*, 745 F.2d 1275, 1278 (9th Cir. 1984) (citation omitted).

Ms. Ashiegbu has squarely denied being informed of her *Miranda* rights before her custodial interrogation, and therefore did not knowingly waive those rights. *See Exh. A, L. Ashiegbu Decl.* at 5 ¶ 43. Because she was not advised of these rights, all responses to Agent Brown's interrogation are presumptively involuntary and must be suppressed. *United States v. Andaverde*, 64 F.3d 1305, 1310 (9th Cir. 1995) ("When a suspect is subject to custodial interrogation without first being advised of his rights, '*Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief.'") (*quoting Oregon v. Elstad*, 470 U.S. 298, 317 (1985)).

## C.    Custodial Interrogation Was Unlawful After Ms. Ashiegbu Invoked Her Right to Counsel

The importance of *Miranda* warnings has become entrenched in American society. *See Dickerson v. United States*, 530 U.S. 428, 443 (2000) ("*Miranda* has become

1    embedded in routine police practice to the point where the warnings have become part of

2    our national culture.")   The "right to counsel" is a particularly important component of

3    these *Miranda* protections – so much so that the Supreme Court has explained that

4    "[L]aw enforcement officers must immediately cease questioning a suspect who has

5    clearly asserted his right to have counsel present during custodial interrogation." *Davis v.*

6    *United States*, 512 U.S. 452, 454 (1994) (*quoting Edwards v. Arizona*, 451 U.S. 477

7    (1981)). The rule is plain: "[A] suspect who has invoked the right to counsel cannot be

8    questioned regarding any offense unless an attorney is actually present." *Davis*, 512 U.S.

9    at 458 (1994) (*citing Minnick v. Mississippi*, 498 U.S. 146 (1990)); *see also Alvarez v.*

10    *Gomez*, 185 F.3d 995, 997 (9th Cir. 1999) ("[I]f a suspect requests counsel at any time

11    during the interview, he is not subject to further questioning until a lawyer has been made

12    available or the suspect himself reinitiates conversation."). Indeed, the Ninth Circuit has

13    described a request for counsel as "a per se invocation of the constitutional right to

14    remain silent." *Cooper v. Dupnik*, 963 F.2d 1220, 1252 (9th Cir. 1992).

15        Because Ms. Ashiegbu repeatedly invoked her right to speak to counsel before the

16    interview, and because that request was repeatedly denied, further questioning was

17    impermissible outside of the presence of her attorney. This is particularly true because

18    Ms. Ashiegbu's invocation of her right to counsel was express and unambiguous, and did

19    not follow valid *Miranda* warnings or waivers.

20        It is an "objective inquiry" as to whether a defendant has unambiguously requested

21    counsel. *Davis*, 512 U.S. at 459. A suspect invokes the right to counsel by uttering "some

22    statement that can reasonably be construed to be an expression of a desire for the

23    assistance of an attorney." *Paulino v. Castro*, 371 F.3d 1083, 1087 (9th Cir. 2004).

24    While the request must be unambiguous, *see Davis,* 512 U.S. at 459, it "need not be

25    stated as a model of eloquence and clarity in order to qualify as an unequivocal

26    invocation of the right to counsel." *Alvarez v. Gomez*, 185 F.3d 995, 997 (9th Cir. 1999).

27    Thus, a suspect who asks a question such as "Can I get an attorney right now, man?," has

28    invoked his right to counsel, and any responses he may give to further questioning must

be suppressed. *See id.* at 998.

1    Notably, the Ninth Circuit has a unique requirement for determining whether the

2  *Davis* invocation is sufficiently clear. In the Ninth, "'the clear statement' rule of *Davis*

3  applies only *after* the police have already obtained an un-ambiguous and unequivocal

4  waiver of *Miranda* rights. Prior to obtaining such a waiver, however, an officer must

5  clarify the meaning of an ambiguous or equivocal response to the *Miranda* warning

6  before proceeding with general interrogation." *United States v. Rodriguez*, 518 F.3d 1072,

7  1074 (9th Cir. 2008) (emphasis in original). Thus, even if the government contends in its

8  Opposition that Ms. Ashiegbu's request to speak to her counsel was ambiguous, her

9  custodial interrogation was still impermissible because there was no valid *Miranda*

10  waiver before her invocation, and Special Agent Brown made no attempt to clarify Ms.

11  Ashiegbu's requests to speak to counsel.

12    In reality, Linda Ashiegbu clearly and unambiguously invoked her right to counsel

13  early in the morning's events, and did so before she was interrogated by Agent Brown.

14  *See Exhibit A, Decl. Linda Ashiegbu* at 3 ¶ 21 ("After I was brought downstairs and told

15  to sit next to my husband, I asked the ICE Agents to be allowed to call my attorney, Mr.

16  Phil Vaughns.") This invocation ends the inquiry: Ms. Ashiegbu was not permitted to

17  speak to counsel, was subjected to custodial interrogation after her invocation, and her

18  counsel was not present. Her request to speak to counsel is a *per se* invocation of the right

19  to silence, *Cooper*, 963 F.2d at 1252, and any statement she made to the ICE agents after

20  this invocation were presumptively involuntary and must be suppressed.

21    **D.    Ms. Ashiegbu Did Not Waive Her *Miranda* Rights or Abandon Her**
22           **Right to Speak to Counsel**

23    Ms. Ashiegbu has explained in her declaration that over an hour into the search

24  (and after her request to speak to her attorney, Mr. Vaughns, had been denied) she asked

25  the agents "why they were searching [her] house." *Exh. A, L. Ashiegbu Decl.* at 4 ¶ 28.

26  The government cannot use this fact to salvage its deeply-flawed interrogation, by

27  arguing that Ms. Ashiegbu voluntarily initiated the conversation with Agent Brown.

28  "When an accused has invoked his right to have counsel present during custodial

interrogation, a valid waiver of that right cannot be established by showing only that he

1    responded to further police-initiated custodial interrogation even if he has been advised of

2    his rights." *Minnick*, 498 U.S. at 150 (*quoting Miranda*, 384 U.S. at 474); *see also Smith*

3    *v. Illinois*, 469 U.S. 91, 98 n.7 (1984) ("Whether in the same interrogating session or in

4    subsequent sessions, the so-called "flavor" of an accused's request for counsel cannot be

5    dissipated by continued police questioning."). Moreover, "[a] suspect's responses to

6    further questioning cannot be used to cast doubt upon the adequacy of his initial request."

7    *Smith v. Endell*, 860 F.2d 1528, 1529 (1988).

8        When she asked to speak to counsel, Ms. Ashiegbu also simultaneously invoked

9    her right to silence until counsel was present. *Cooper*, 963 F.2d at 1252. Beyond the

10   bright-line bar to further questioning (an insurmountable hurdle to the government's use

11   of these statements) there are strong equitable reasons why Ms. Ashiegbu's inquiry does

12   not constitute a *Miranda* waiver. As she explained in her declaration, when she asked the

13   agents why they were searching her house:

14       ● The agents had not told the Ashiegbus why there were in the house;

15
16       ● In violation of Federal Rule of Criminal Procedure 41, the agents had not given the Ashiegbus a copy of the search warrant;

17
18       ● Ms. Ashiegbu was effectively nude in front of strangers, including several male ICE agents;

19
20       ● The couple's very young children were screaming, crying, and could not be consoled;

21       ● ICE agents were ransacking the Ashiegbu's home;
22
23       ● Ms. Ashiegbu was not being permitted to call her attorney.

24   *Exh. A., L. Ashiegbu Decl.* at 4 ¶ 28. Any reasonable citizen would have a more than

25   passing curiosity as to why they were being subjected to these indignities: Ms.

26   Ashiegbu's inquiry was a reasonable request for information, and cannot be fairly cast as

27   a *Miranda* waiver.

28        It would be particularly unfair to characterize this inquiry as a *Miranda* waiver,

   because the ICE agents created the atmosphere of uncertainty by failing to provide the

1   search warrant at the outset of the search as required by Rule 41. Federal agents cannot

2   intentionally fuel uncertainty and fear by keeping citizens in the dark about the reasons

3   for a search, and then prey upon this uncertainty to extract *Miranda* waivers when a

4   demand for an explanation is made.

5        Ms. Ashiegbu did not voluntarily waive her *Miranda* rights and initiate the

6   conversation with Agent Brown at any time during the search. Her statements to the agent

7   were involuntary, and must be suppressed.

8            **E.    The Defense Requests an Evidentiary Hearing**

9        The government may agree to each of the Ashiegbus's factual assertions,

10  permitting the Court to grant Ms. Ashiegbu's motions on the papers at the June 11th

11  hearing.

12       If, however, the government contests these factual assertions, the defense requests

13  an evidentiary hearing. *See, e.g., Madoch*, 149 F.3d at 601 (concluding that it was plain

14  error for the district court to have resolved the *Miranda* suppression issue without an

15  evidentiary hearing, when the defendant made detailed allegations of the illegality of

16  interrogation).

17           **F.    The Defense Invites the Government to Participate in a Settlement
                     Conference**
18

19       All of the (present) defendants in these two cases are open to participating in a

20  settlement conference presided over by a magistrate judge. If the government accepts the

21  defense invitation to participate in a settlement conference, undersigned counsel will

22  prepare a proposed stipulated order continuing the hearing on these motions and delaying

23  the due date for the government's Opposition until after the conference. If the settlement

24  conference produces a global resolution, it will conserve the Court's and government's

25  resources by mooting these motions (which will presumably be withdrawn as part of any

26  disposition).

27  //

28  //

1
2                                    **Conclusion**
3          For the foregoing reasons the defense respectfully requests that the Court suppress
4  all fruits of the June 6 search, which was not conducted in accordance with Federal Rule
5  of Criminal Procedure 41. The defense further requests that the Court suppress the
6  involuntary statements of Linda Ashiegbu, elicited during a custodial interrogation.
7
8  Dated: May 14, 2008
9
10                                   Respectfully submitted,
11
                                     BARRY J. PORTMAN
12                                   Federal Public Defender

13                                   /s

14                                   STEVEN G. KALAR
15                                   Assistant Federal Public Defender
16
17
18
19
20
21
22
23
24
25
26
27
28